PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos.  12-1697 & 12-2878
_____

IN RE:  GRAND JURY

JOHN DOE 1; JOHN DOE 2; ABC CORPORATION,
ABC Corp.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Grand Jury Action No. 2-09-gj-00006)
District Judge:  Honorable Harvey Bartle, III
_____

Argued October 9, 2012
_____

Before:  AMBRO, HARDIMAN
and VANASKIE, Circuit Judges

(Opinion file: December 11, 2012)

Stephen R. LaCheen, Esquire (Argued)
LaCheen Wittels & Greenberg
1429 Walnut Street, Suite 1301
Philadelphia, PA   19102-0000

Ian M. Cominsky, Esquire (Argued)
Matthew D. Lee, Esquire
Blank Rome
130 North 18th Street
One Logan Square
Philadelphia, PA  19103

 Counsel for ABC Corp.

Frank P. Cihlar, Esquire
Gregory V. Davis, Esquire
S. Robert Lyons, Esquire
Alexander P. Robbins, Esquire (Argued)
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC   20044-0000

Karen L. Grigsby, Esquire
Patrick J. Murray, Esquire
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA   19106

David I. Sharfstein, Esquire
United States Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, DC   20530-0000

 Counsel for Appellee

_____

OPINION OF THE COURT
_____

AMBRO, Circuit Judge

ABC Corp., John Doe 1, and John Doe 2 are subjects of an ongoing grand jury investigation into an alleged criminal tax scheme.[1] As part of that scheme, ABC Corp., under the direction of John Doe 1 and John Doe 2, purchased and subsequently sold numerous companies. These consolidated appeals concern whether documents and testimony relating to legal advice obtained by ABC Corp. in connection with these transactions are shielded by the attorney-client and work product privileges.

When ABC Corp. objected that the Government had improperly served a subpoena for documents on ABC Corp., the Government issued grand jury subpoenas for those documents to ABC Corp.'s current outside counsel— LaCheen, Wittels & Greenberg, LLP, and Blank Rome, LLP. Later, it also served subpoenas for documents and testimony on three attorneys formerly employed by ABC Corp. as in-house counsel. In each instance, the firms and counsel asserted attorney-client and work product privileges on ABC Corp.'s behalf, the Government moved to enforce the subpoenas, and ABC Corp. opposed the motion as the purported privilege holder.

_____

[1] We use pseudonyms to refer to the grand jury subjects to protect the secrecy of the grand jury investigation and the anonymity of the subjects.

3

The District Court granted the Government's motions to enforce based in part on the crime-fraud exception, which permits the Government to obtain access to otherwise privileged communications and work product when they are used in furtherance of an ongoing or future crime. Finding that the requested communications and work product either did not qualify as privileged or that any protection afforded was vitiated by this exception, the Court largely rejected ABC Corp.'s privilege claims and issued corresponding disclosure orders—the first directed to ABC Corp., LaCheen Wittels, and Blank Rome in March 2012 (the "March Order"), and the second directed to the three in-house counsel in June 2012 (the "June Order").

ABC Corp. seeks to appeal these Orders.[2] Disclosure orders are not normally immediately appealable final decisions. To obtain immediate appellate review, a privilege holder must disobey the court's order, be held in contempt, and then appeal the contempt order. That has not happened here. ABC Corp. argues nonetheless that it can appeal under an exception to the contempt rule established in *Perlman v. United States*, 247 U.S. 7 (1918). Under *Perlman*, a privilege holder may immediately appeal an adverse disclosure order when the traditional contempt route is unavailable to it because the privileged information is controlled by a disinterested third party who is likely to disclose that information rather than be held in contempt for the sake of an immediate appeal.

---

[2] John Doe 1 and John Doe 2 also seek to appeal. Because we conclude they lack standing to do so, *see infra* Part II, we dismiss their appeals.

We disagree that we have jurisdiction to hear ABC Corp.'s appeal from the March Order.[3] It directs both ABC Corp. and the law firms to produce the withheld documents. While Blank Rome is in physical possession of them, it is holding them at the behest of ABC Corp. If ABC Corp. wants immediate appellate review, it can take possession of the documents, defy the disclosure Order, and appeal any resulting contempt sanctions.[4] Because it has not yet taken these steps, we dismiss its appeal from the March Order for lack of appellate jurisdiction.

We agree, however, that we have jurisdiction to hear ABC Corp.'s appeal from the June Order, which is directed solely to its former in-house counsel. ABC Corp. cannot be held in contempt of this Order because it does not direct ABC Corp. to take or refrain from any action. And there is no indication that ABC Corp.'s former employees are anything but disinterested third parties unwilling to be held in contempt to vindicate its purported privilege. We therefore reach the merits of ABC Corp.'s appeal from the June Order.

---

[3] We previously issued an opinion and judgment on May 24, 2012, dismissing the appeal of the March Order for lack of jurisdiction. Although we continue to dismiss the appeal for lack of jurisdiction, we vacate that opinion to avoid any confusion—particularly with respect to our *dicta* in that opinion regarding a recent Supreme Court case, *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599 (2009).

[4] As we explain below, if the parties cannot agree on how to transfer the documents, the District Court should impose a suitable method of transfer.

ABC Corp. alleges a series of problems with that Order: (1) the Court applied the wrong standard of proof in determining whether the Government made a sufficient showing to support application of the crime-fraud exception; (2) no matter the proof required, the Court wrongly found that the Government satisfied its burden; (3) the Court erred in applying the crime-fraud exception to work product generated by the in-house counsel because there is no suggestion these attorneys were involved in the alleged criminal scheme; and (4) with respect to five particular documents, the Court ruled incorrectly that they either did not qualify as privileged or were subject to the crime-fraud exception.

We sympathize with the difficult position of ABC Corp.'s attorneys. They are arguing against the applicability of the crime-fraud exception without knowledge of the underlying evidence for that exception. Because this evidence would reveal aspects of the grand jury's investigation and thus cannot be made public, the District Court filed its March and June Orders under seal and provided only redacted copies to the parties. *See* Fed. R. Crim. P. 6(e)(2). Though we limit our discussion to background facts already disclosed to both parties in order to maintain this secrecy, we have received and closely reviewed unredacted versions of the Orders, as well as secret grand jury information submitted *ex parte* by the Government.[5] On the basis of that review, we affirm the District Court's June Order.

---

[5] Though we only have jurisdiction to hear ABC Corp.'s appeal of the District Court's June Order, we review the Court's crime-fraud findings from its March Order to the extent they formed the basis for its June Order.

## I. Background

### A. The Alleged Criminal Scheme

ABC Corp., John Doe 1, and John Doe 2 are subjects of an ongoing grand jury investigation that seeks to determine whether they and others undertook fraudulent business transactions in order to evade federal income taxes. ABC Corp. is an administratively "dissolved" corporation. It was formed in early 2004 and it ceased business operations in late 2005. John Doe 1 was the company's President and sole (though indirect) shareholder. John Doe 2, who was also affiliated with the company, is his son.

During ABC Corp.'s existence, it acquired companies with large cash accounts, few or no tangible assets, and considerable tax liabilities. ABC Corp. would transfer these target companies to two limited liability companies. According to the Government, shortly thereafter the limited liability companies would engage in various transactions that had the effect of fraudulently eliminating the target companies' tax liabilities. Having done so, John Doe 1 and John Doe 2 would then divert the target companies' cash assets to themselves and their family members.

### B. The District Court's March Order

In December 2010, the grand jury issued a subpoena to ABC Corp.'s former vice president of corporate acquisitions as the company's custodian of records. The subpoena sought all records relating to transactions and business dealings between ABC Corp. and specific entities, including the two limited liability companies implicated in the alleged criminal scheme. At some time the Government received access to, or copies of, ABC Corp. documents from a law firm that previously represented the company. The firm withheld

7

documents that ABC Corp. claimed were privileged but did not supply the Government with a privilege log.

ABC Corp. subsequently changed representation. LaCheen Wittels now represents ABC Corp. and John Doe 1, while Blank Rome represents John Doe 2. As is often the case, the grand jury subjects have a joint-defense agreement in place.

Following this change in representation, the documents that had been held by ABC Corp.'s former outside counsel were transferred to Blank Rome. The documents were transferred to Blank Rome rather than Lacheen Wittels because, according to ABC Corp., LaCheen Wittels does not have sufficient space to store the documents. After the documents were transferred, ABC Corp. provided the Government with a privilege log in April 2011 for the documents it was withholding. Despite previously producing documents and providing this privilege log, ABC Corp. for the first time also took the position that the Government had not effectively served the subpoena on its former vice president.

To address any problems arising from its alleged service error, the Government served grand jury subpoenas on LaCheen Wittels and Blank Rome. The subpoenas sought all documents relating to ABC Corp. that Blank Rome received from ABC Corp.'s former outside counsel. In response to these subpoenas, Blank Rome produced approximately 24 boxes of documents. It continued to withhold, however, the documents listed in the April 2011 privilege log, and ABC Corp. provided the Government with another privilege log in June 2011 for additional documents withheld.

Thereafter the Government filed a motion to enforce the subpoenas, requesting that ABC Corp., Blank Rome, and

8

LaCheen Wittels be required to disclose 171 of the 303 documents identified in the privilege logs. It argued that even if the documents were otherwise entitled to protection under the attorney-client privilege and work product doctrine, the crime-fraud exception wipes away that protection.

The March Order directed ABC Corp., Blank Rome, and LaCheen Wittels to produce 167 of the 171 requested documents. The District Court concluded that the crime-fraud exception barred ABC Corp.'s privilege and work product claims. It did not resolve whether the Government had properly served ABC Corp.

Five days later, ABC Corp., John Doe 1, John Doe 2 filed a timely notice of appeal and a motion for a stay of the District Court's order pending appeal. We granted the stay and expedited the appeal.[6]

In May 2012, we issued an opinion and judgment dismissing the appeal for lack of jurisdiction because ABC Corp. could receive immediate appellate review by taking possession of the documents, refusing to produce them, and then appealing any contempt sanctions imposed by the District Court. We left it to ABC Corp., the Government, and

---

[6] ABC Corp. had previously attempted another *Perlman* appeal in this matter. *See In re Grand Jury Matter #4*, No. 11-4105 (3d Cir. Dec. 20, 2011) (dismissing summarily for lack of jurisdiction). According to ABC Corp., the documents at issue in that appeal had already been turned over to and reviewed by the Government by the time the panel issued its order. Here, in contrast, the documents are not in the Government's possession and the Government has not reviewed them.

the District Court to select a procedure for transferring the documents from Blank Rome to ABC Corp. if it still wished to pursue a contempt appeal.

Shortly after our May 2012 order issued, the parties had a conference call with Judge Bartle to discuss how to transfer the documents from Blank Rome to ABC Corp. Following that call, Blank Rome sent a letter to the Government proposing two potential mechanisms for permitting ABC Corp. to seek appellate review following a contempt sanction: (1) Blank Rome could transfer possession of the privileged documents to the Clerk of the Court, who would hold the documents until ABC Corp. either decided not to be held in contempt or until after final appellate review; or (2) the Government could stipulate that even if the documents remained in the physical possession of Blank Rome, they are being held by that firm as an agent for ABC Corp. Under either scenario, if ABC Corp. decided to refuse to comply with the disclosure order, only it would be subject to contempt sanctions.

The Government, in a letter dated May 30, 2012, rejected both of these proposals "because they provide no avenue for a meaningful contempt sanction." It also noted its belief that the law firms could still be held in contempt for not producing the documents if the parties could not come to an agreement on how to transfer the documents.

After we granted its motion to lift the stay in this case on June 5, 2012, the Government sent a letter to Judge Bartle enclosing a proposed order outlining a procedure for transferring the documents. If entered, it would require Blank Rome either to (1) appear in court and produce the documents at issue to the Government or (2) appear in court and produce documents to a representative of ABC Corp. who was willing and authorized to (a) accept service on behalf of ABC Corp.,

10

(b) take custody of and maintain the transferred documents until produced to the Government, and (c) suffer significant contempt sanctions. The District Court was unable to act on the proposed order, however, because we reinstated the stay on June 6, 2012.

ABC Corp., John Doe 1, and John Doe 2 subsequently filed a petition for panel rehearing or rehearing *en banc*. We granted the petition for a panel rehearing to revisit, in light of the developments on remand, our holding that we lacked jurisdiction under *Perlman* to hear this appeal.

C. The District Court's June Order

In December 2011 grand jury subpoenas were issued to three attorneys formerly employed by ABC Corp. as in-house counsel. Each of the attorneys received two subpoenas, one seeking testimony and documents from that attorney in his or her individual capacity and one seeking documents and testimony from him or her as a custodian of records for ABC Corp.

In response to these subpoenas, the attorneys withheld 45 documents and refused to testify as to certain matters on the grounds that the information sought is shielded from production by the attorney-client privilege and the work product doctrine.[7] When the Government subsequently filed a motion to enforce the subpoenas, ABC Corp., who successfully intervened to contest the subpoena, opposed that motion on the same grounds.

---

[7] One of the attorneys did not withhold any documents as privileged because she claims not to have any documents responsive to the subpoena.

The June Order reaffirmed the District Court's prior crime-fraud ruling. The Court required the in-house counsel to produce 11 of the 45 withheld documents, finding that they were either not privileged at all or that any privilege was vitiated by the crime-fraud exception. It also instructed the attorneys to testify about transactions involving the target companies that ABC Corp. ultimately sold to the two limited liability companies implicated in the alleged criminal scheme.

ABC Corp., John Doe 1, and John Doe 2 subsequently filed a notice of appeal and the District Court granted a stay of their order pending appeal. We consolidated the appeals of the District Court's March and June Orders.

## II. Standing

Although the Government does not challenge Appellants' standing, we are obliged to address it *sua sponte*. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990) (quoting *Anthony v. Council*, 316 F.3d 412, 416 (3d Cir. 2003)). A person has standing to challenge a grand jury subpoena issued to another when he has a "sufficiently important, legally-cognizable interest[] in the materials or testimony sought." *In re Grand Jury*, 111 F.3d 1066, 1073 (3d Cir. 1997) (collecting cases). ABC Corp. has standing to challenge the grand jury subpoenas because it claims attorney-client and work product privileges in the documents and testimony at issue. *Id.*[8] John Doe 1 and John Doe 2, in contrast, do not hold any privilege in the sought-after documents or testimony and have not asserted any other interest in them. They therefore lacked standing to oppose

---

[8] ABC Corp. also has standing to challenge the March Order because one of the subpoenas challenged was issued to it.

12

the Government's motion to enforce the subpoenas,[9] and do not have standing to appeal the District Court's resulting Orders.

## III.    Jurisdiction

The District Court had jurisdiction under 18 U.S.C. § 3231.  Although our jurisdiction is in dispute, we have the jurisdiction to decide that dispute.  *Alaka v. Att'y Gen.*, 456 F.3d 88, 94 n.8 (3d Cir. 2006).

### A.  Finality and the Contempt Rule

"[T]he right to a judgment from more than one court is a matter of grace and not a necessary ingredient of justice . . . ."  *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).  Congress has bestowed this grace by granting the courts of appeals jurisdiction over "final decisions" of the district courts.  28 U.S.C. § 1291.  Whether a decision is "final" depends on its effects.  *Marcus v. Twp. of Abington*, 38 F.3d 1367, 1370 (3d Cir. 1994).  "Ordinarily, a final decision will have two effects.  First, the decision will fully resolve all claims presented to the district court.  Second, after the decision has been issued, there will be nothing further for the district court to do."  *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 557 (3d Cir. 1997) (citing *Catlin v. United States*, 324 U.S. 229, 233 (1945)).

---

[9] Although the District Court permitted them to respond to the Government's motions to enforce, John Doe 1 and John Doe 2, unlike ABC Corp., never formally moved to intervene in the action, and the Court did not discuss whether they had a legally cognizable interest.

13

When a district court orders a witness—whether a party to an underlying litigation, a subject or target of a grand jury investigation, or a complete stranger to the proceedings—to testify or produce documents, its order generally is not considered an immediately appealable "final decision[]" under § 1291. *See United States v. Ryan*, 402 U.S. 530, 532–34 (1971); *Cobbledick*, 309 U.S. at 326–29; *Alexander v. United States*, 201 U.S. 117, 118–22 (1906). It is well settled that a witness who "seeks to present an objection to a discovery order immediately to a court of appeals must refuse compliance, be held in contempt, and then appeal the contempt order." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 18 n.11 (1992) (citing *Ryan*, 402 U.S. 430); *see also Cobbledick*, 309 U.S. at 326–29; *Alexander*, 201 U.S. at 118–22; *DeMasi v. Weiss*, 669 F.2d 114, 121–23 (3d Cir. 1982). A district court's contempt order is itself immediately appealable because it is a final judgment imposing penalties on the willfully disobedient witness in what is effectively a separate proceeding.

The contempt route to an immediately appealable final decision is a firmly established feature of federal appellate procedure, stretching back to at least the Supreme Court's 1906 decision in *Alexander*, but the decision to travel that route must not be made lightly. The Supreme Court has

consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the

14

concomitant possibility of an adjudication of contempt if his claims are rejected on appeal.

*Ryan*, 402 U.S. at 533 (citations omitted).  The rule, "though at times a harsh one, was formulated to discourage appeals in all but the most serious cases."  *In re Grand Jury Proceedings*, 604 F.2d 798, 800 (3d Cir. 1979).  Requiring a person who objects to a disclosure order to "refuse to comply, be subjected to sanctions in contempt, and then appeal from the sanctions . . . [,] puts the objecting person's sincerity to the test by attaching a price to the demand for immediate review."  *Wilson v. O'Brien*, 621 F.3d 641, 643 (7th Cir. 2010).  It forces the objector to weigh carefully the likelihood of success of its challenge to the underlying disclosure order against the seriousness of the sanctions it would face— whether incarceration, a hefty monetary fine, or some other penalty—if it disobeys the order to disclose.  It also forces the objector to assess the importance it attaches to avoiding the ordered disclosure and protecting any associated privileges.

## B.  The *Perlman* Exception to the Contempt Rule

In *Perlman v. United States*, 247 U.S. 7 (1918), the Supreme Court carved out an exception to the rule that a privilege holder must stand in contempt of a disclosure order before an immediate appeal may be taken.

Louis Perlman testified on behalf of his company in a patent infringement suit in District Court. *Id.* at 8.  When the company moved to dismiss its suit without prejudice, the District Court granted the company's motion, but it ordered the court clerk to impound the exhibits Perlman used during his testimony and to maintain them under seal.  *Id.* at 8–9.

15

Soon after, the Government began a grand jury investigation of Perlman, suspecting him of perjury during his prior testimony. *Id.* at 11–12. To assist in the investigation, the Government sought an order from the District Court directing the court clerk to produce the exhibits Perlman used during his testimony. *Id.* at 9–10. Perlman objected, claiming that use of the exhibits as a basis for indictment against him would be an unreasonable search and seizure and would make him a compulsory witness against himself in violation of the Constitution's Fourth and Fifth Amendments. *Id.* at 10, 13. The District Court rejected Perlman's challenge and ordered the clerk to produce the exhibits to the Government. *Id.* at 10–11.

When Perlman ultimately appealed to the Supreme Court, which heard the case under its then-obligatory appellate jurisdiction, the Government argued that the District Court's disclosure order was not appealable. *Id.* at 12. The Supreme Court disagreed, saying only that

> [t]he second contention of the government is somewhat strange, that is, that the order granted upon its solicitation was not final as to Perlman but interlocutory in a proceeding not yet brought and depending upon it to be brought. In other words, that Perlman was powerless to avert the mischief of the order but must accept its incidence and seek a remedy at some other time and in some other way. We are unable to concur.

*Id.* at 12–13.

16

Though the *Perlman* doctrine's reach has not been set precisely by the Supreme Court, it generally permits an interlocutory appeal of a disclosure order if it is directed at a disinterested third party lacking a sufficient stake in the proceeding to risk contempt by refusing compliance. *See Church of Scientology*, 506 U.S. at 18 n.11; *United States v. Nixon*, 418 U.S. 683, 691 (1974).[10] In that circumstance, the privilege holder is allowed to appeal immediately without suffering contempt sanctions because the privilege holder cannot itself disobey the disclosure order and the third party to whom the disclosure order is directed is unlikely to do so on its behalf. *See In re Grand Jury Empanelled Aug. 14, 1979*, 638 F.2d 1235, 1237 (3d Cir. 1981) (explaining that the privilege holder in *Perlman* and its progeny "were not the targets of the subpoena itself, which meant that the contempt route for obtaining an appeal was not available to them"); *In re Grand Jury Applicants*, 619 F.2d 1022, 1025 (3d Cir. 1980) (explaining that "the *Alexander-Cobbledick-Ryan* [contempt] rule restricting appellate review is limited to situations where the contempt route to a final order is available to the appellant"); *In re Grand Jury Proceedings*, 604 F.2d at 800–01 (permitting *Perlman* appeal where the disclosure order adverse to the attorney-client privilege was not directed to the privilege holder); *In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, 490 F.3d 99, 105–06 (2d Cir. 2007); *Wilson*, 621 F.3d at 642–43; *In re Motor Fuel*

---

[10] For example, in *Perlman* the clerk of the court presumably lacked any stake in Perlman's grand jury proceedings to risk contempt by refusing to comply with the subpoena. *See Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 591 F.2d 174, 179 (2d Cir. 1979) ("In fact it was not only 'unlikely' but unimaginable." (quoting *United States v. Nixon*, 418 U.S. 683, 691 (1974)).

17

*Temperature Sales Practices Litig.*, 641 F.3d 470, 485–86 (10th Cir. 2011).

C. *Mohawk* and its Effect on *Perlman*

In addition to contempt and *Perlman* appeals, some courts permitted privilege holders to take immediate appeals of adverse privilege determinations if they could satisfy the requirements of the collateral order doctrine. The doctrine, first announced in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), provides that there is a small class of collateral rulings that, although they do not terminate the litigation, are appropriately deemed final under § 1291. *Id.* at 545–46. "That small category includes only decisions [1] that are conclusive, [2] that resolve important questions separate from the merits, and [3] that are effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 45 (1995).

In *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599 (2009), however, the Supreme Court held that disclosure orders adverse to the attorney-client privilege do not qualify for immediate appeal under the collateral order doctrine. Focusing exclusively on the third requirement of the collateral order doctrine, the *Mohawk* Court held that "collateral order appeals are not necessary to ensure effective review of orders adverse to the attorney-client privilege" where the privilege holder is a party to the litigation because "postjudgment appeals generally suffice to protect the rights of litigants and assure the vitality of the attorney-client privilege." *Mohawk*, 130 S. Ct. at 606. "Appellate courts can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 606–07.

The Government argues that this decision narrows the traditionally understood scope of the *Perlman* doctrine to instances where effective postjudgment review is unavailable. Deciding whether *Mohawk* precludes our jurisdiction in this case—where the privilege holder, ABC Corp., is a subject of a grand jury investigation—prompts two distinct inquiries.

The first is whether *Mohawk*, which dealt with the collateral order doctrine, applies to the *Perlman* rule at all. Other courts of appeals—*see Holt-Orsted v. City of Dickson*, 641 F.3d 230, 236–40 (6th Cir. 2011); *United States. v. Krane*, 625 F.3d 568, 572–73 (9th Cir. 2010); *Wilson*, 621 F.3d at 642–43—have concluded that the Supreme Court's reasoning in *Mohawk* about the effective reviewability of disclosure orders that would break the attorney-client privilege applies equally to *Perlman* so long as the privilege holder is a party to an underlying litigation. When that is the case, those claims can be reviewed effectively postjudgment, making immediate appeals unnecessary.

Assuming *Mohawk* narrows *Perlman* at all, the second inquiry is whether this reasoning extends to prohibit *Perlman* appeals from grand jury investigations. An order requiring the disclosure of privileged materials arguably is as effectively reviewable, absent an immediate appeal, for subjects of a grand jury investigation as it is for parties in civil litigation. If the grand jury's investigation leads to an indictment and later a conviction, we can remedy an "improper disclosure of privileged material . . . by vacating the adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Mohawk*, 130 S. Ct. at 606–07. Of course, this may not always be the case. A subject of a grand jury investigation may not actually have an opportunity for post-conviction review of a disclosure order; he may never be indicted, the charges may be dismissed, or he may be

19

acquitted. The same is often true in civil litigation, however. After an unfavorable privilege ruling, a civil litigant may nonetheless settle, obtain summary judgment, or win a favorable verdict, leaving the privilege broken and the District Court's ruling unchallenged.

Regardless, we decline to hold that the Supreme Court narrowed the *Perlman* doctrine—at least in the grand jury context—*sub silentio*. *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Perlman himself sought to prevent the disclosure of documents to a grand jury that was conducting an investigation into whether he committed perjury in a patent infringement action. The Supreme Court has not subsequently suggested that Perlman's status as a grand jury subject would today deny him immediate appellate review and the *Mohawk* Court gave no clear indication that this was a consequence of its intended holding. It did not discuss, mention, or even cite *Perlman*, a fact that is not that surprising given that the *Perlman* doctrine and the collateral order doctrine recognize separate exceptions to the general rule of finality under § 1291. *See Krane*, 625 F.3d at 572.[11]

---

[11] The *Mohawk* Court surveyed other appellate options available to aggrieved privilege holders, and indicated that, when confronted with an adverse decision from the district

20

The Government argues that we should nonetheless hold that the *Mohawk* Court narrowed *Perlman* because "*Mohawk*'s description of the final-judgment rule relied on . . . precedent regarding what it means for an order to be effectively 'final,' and this precedent indisputably includes *Perlman*." Government's Br. at 26 (Aug. 31, 2012). The Government cites *Ryan* for its statement that all appeals under § 1291—which includes both collateral order and *Perlman* appeals—should be limited to "cases where denial of immediate review would render impossible any review whatsoever of an individual's claims." 402 U.S. at 533; *see also Cobbledick*, 309 U.S. at 328 (noting that the "analysis of finality" applied in *Cobbledick* is "illustrated" by *Perlman*). In the same passage of *Ryan*, however, the Court described *Perlman*—a case where the privilege holder was a grand jury subject—as satisfying the finality requirement. 402 U.S. at 533.

We cannot say that the Supreme Court has abandoned that determination on the basis of a later case, *Mohawk*, that never cites, let alone discusses, *Perlman*. If and when that Court next hears a case involving the *Perlman* doctrine, it may well hold that the doctrine does not allow grand jury subjects to receive immediate appellate review of adverse privilege determinations. And, given the need for judicial efficiency in the criminal context, such a decision may be

court, a party in a civil proceeding can still receive an immediate appeal via the contempt route. 130 S. Ct. at 607–08. This may indicate that the *Perlman* doctrine, which can be seen as an exception to the normal rule requiring a privilege holder to be held in contempt to appeal interlocutory, remains in place where the holder is a civil litigant or grand jury subject.

21

justifiable. We will not, however, intrude on the Supreme Court's prerogative to make that determination. We therefore conclude that the *Perlman* exception remains viable.

D. Jurisdiction over Appeal from the District Court's March Order

We dismiss ABC Corp.'s appeal of the District Court's March Order because the contempt route remains open to it. It is subject to a Court Order to produce the documents. Although the documents are in the physical possession of Blank Rome, they are ABC Corp.'s documents and are under its legal control.[12] *See In re Grand Jury*, 821 F.2d 946, 951 (3d Cir. 1987) ("A party's lack of possession or legal control over documents requested by a subpoena is normally a valid defense to a subpoena and justification for a motion to quash."); *In re Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir. 1983) ("The test for the production of documents is control, not location."). ABC Corp. is responsible for deciding whether to produce or withhold the documents, and could properly be held in contempt for directing the law firms to withhold them.[13]

_____

[12] Federal Rule of Criminal Procedure 17(c) permits a court to "quash or modify the subpoena if compliance would be unreasonable or oppressive." Whatever else Rule 17(c) requires, it would not be unreasonable or oppressive to require a witness to produce documents within his legal control simply because those documents are in the physical possession of another.

[13] ABC Corp. asserts that the District Court's order erroneously included ABC Corp. because the Government never properly served the company with a subpoena and, in

The situation is complicated because the Court's Order is also directed at ABC Corp.'s outside counsel, exposing them to potential contempt sanctions if they do not comply with it.[14] We recognize that production of the documents by

any event, ABC Corp. does not have custody of the documents. This argument misses the mark. An order does not become immediately appealable simply because a putative appellant believes that it is, in one way or another, wrong or improper. If ABC Corp. believes that the District Court's order is reversible for whatever reason—whether because it was not preceded by proper service of a subpoena, because it was the result of an improper crime-fraud ruling, or for any other reason—and it wishes to present its challenge in an immediate appeal, it must disobey the order and take the contempt route. Until it is vacated, the District Court's order—not the grand jury's subpoena—binds the company and compels production of the documents. *See Brown v. United States*, 359 U.S. 41, 49 (1959) ("A grand jury is clothed with great independence in many areas, but it remains an appendage of the court, powerless to perform its investigative function without the court's aid, because powerless itself to compel the testimony of witnesses."), *overruled on other grounds by Harris v. United States*, 382 U.S. 162, 167 (1965).

[14] Judge Vanaskie agrees that we lack jurisdiction to review the March Order to the extent it requires production directly by ABC Corp. because it may obtain appellate jurisdiction by refusing to produce the contested documents and standing in contempt. He dissents from this section of our Opinion, however, because he believes we have jurisdiction over the Order to the extent it requires the law firms to produce the documents. This approach, we believe, bifurcates the Order

the law firms, despite an instruction from ABC Corp. to withhold them, might as a practical matter avert any need for the Government to seek contempt sanctions against ABC Corp. When we first heard oral argument in this case, the Government, in an attempt to address this concern, indicated that it would not seek contempt sanctions against the law firms if the documents were transferred from Blank Rome to ABC Corp.'s possession. We agreed that this course of action would take care of our concern, and instructed ABC Corp., the Government, and the District Court to resolve a plan for transferring the documents.

Unfortunately, piecemeal consensus dissolved to dissonance. ABC Corp. and the Government were unable to agree on a mechanism to transfer the documents. While ABC Corp. believes it sufficient for Blank Rome to transfer the documents generally to the possession of ABC Corp., the Government believes any resulting contempt sanctions against ABC Corp. in that circumstance would be meaningless because the company is defunct. Instead, the Government wants the documents to be transferred to a designated representative of the company who is personally willing to suffer significant contempt sanctions.

According to ABC Corp., this inability to agree indicates we were wrong that the contempt route remains

and emphasizes too technical an understanding of our jurisdiction. Both Judge Vanaskie and we agree that ABC Corp. legally controls the documents and may be held in contempt for refusing to produce them. Unlike Judge Vanaskie, however, we see the law firms' choice whether to follow their client's directions or be held in contempt as a resolvable practical problem, not a basis for our jurisdiction.

open to it. That the parties were unable to resolve this dispute amicably, however, does not mean that the contempt route is foreclosed. The District Court—which was previously hamstrung due to our imposition of a stay of its March Order—is no doubt capable of resolving this dispute for the parties.

We now lift the stay to free the Court to resolve this matter. If ABC Corp. continues to want to pursue a contempt appeal, the Court should determine an appropriate mechanism for transferring the documents from Blank Rome to ABC Corp. While we do not dictate what contempt sanctions the Court imposes or how the documents are transferred, it should effect a transfer that permits it to impose sanctions sufficient to put ABC Corp.'s "sincerity to the test" in determining whether to pursue the contempt route. *In re Grand Jury Proceedings*, 604 F.2d at 800; *see also Wilson*, 621 F.3d at 643.

This may mean, as the Government requests, that the documents are transferred to a representative of ABC Corp. rather than into its general possession. In the normal course, a court can impose sanctions, including monetary fines and incarceration, against a disobedient corporate entity or any corporate officer responsible for the corporation's refusal to obey. *See* Carol A. Jones, 10A Fletcher Cyc. Corp. § 5069 (Thomas Reuters 2011); *Reich v. Sea Sprite Boat Co., Inc.*, 64 F.3d 332, 334 (7th Cir. 1995); *Elec. Workers Pension Trust Fund of local Union #58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 382 (6th Cir. 2003); *NLRB v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st Cir. 1984). If ABC Corp., as a defunct corporation, is nothing more than a ghost without officers or property, these normally effective sanctions may be meaningless. Accordingly, the Court may, in its discretion, designate a representative of ABC Corp. to receive delivery of the documents or require ABC Corp. to do so.

ABC Corp. argues that "[t]here is no one who is ready, willing, or able, under these circumstances, to receive the documents and suffer incarceration to vindicate the privilege rights of [ABC Corp.]" Appellants' Br. at 32 (Aug. 17, 2012). This proves too much. Corporations act through and are controlled by individuals. There must be some person or persons directing ABC Corp. to assert privilege over the withheld documents. If those person(s) are unwilling to suffer contempt sanctions, this only points out that the privilege holder has weighed its chances of success on appeal against the seriousness of the sanctions it will face for disobeying the District Court's Order, and determined that it is unwise to seek immediate appeal.

We stress that if the documents are transferred pursuant to court order (or an eleventh hour agreement between the parties), the law firms—absent bad faith dealings—should not be the target of any sanctions. We are confident that the Government, consistent with its representations to us, will not seek to hold the law firms in contempt in that event. And no doubt the District Court appreciates this difficult predicament.[15]

---

[15] ABC Corp. contends that the Government's position ignores the seriousness of a grand jury subpoena and court order, and that the law firms could be charged with obstruction of justice by engaging in behavior intended to thwart the grand jury's investigation. *See* 18 U.S.C. § 1503 (obstruction of grand jury investigation). These concerns are understandable, but, we believe, unfounded. It would not be obstruction of justice, as the Government conceded at oral argument, if Blank Rome transfers the documents to ABC Corp.—after giving the Government and the District Court sufficient notice of the time, place, and other circumstances of

ABC Corp. cautions that refusing to hear this appeal would "essentially destroy[] the *Perlman* doctrine" because "*Perlman* can now be defeated if the government or another litigant simply names the privilege holder in the motion to compel and includes the privilege holder in the compulsion order, even where the privilege holder is not in possession of the subpoenaed documents." Appellants' Br. at 36. This concern is overstated. Our reasoning would only prevent an appeal where a privilege holder subject to a disclosure order retains legal control of the documents that are in the physical possession of another and the Government has agreed that the documents can be transferred to the privilege holder without the transferor risking contempt.[16] Although the Government may be wise in the future to avoid these complications by issuing a subpoena only to the privilege holder, the contempt

the transfer—so that the company can go down the well-established path of disobeying a disclosure order, suffering contempt, and then appealing any contempt sanctions. Of course, this is not a license for Blank Rome to send the documents out of the jurisdiction or to act with bad faith in any way when transferring the documents to ABC Corp.

[16] Several courts of appeals permit *Perlman* appeals where the disclosure order is directed solely at the privilege holder's attorney. *In re Grand Jury Subpoenas*, 123 F.3d 695, 698-700 (1st Cir. 1997) (collecting cases). These cases are properly distinguished because their disclosure orders were not also directed at the privilege holder, making it effectively impossible for the holder to be held in contempt. These cases often concern as well the production of subpoenaed documents (*e.g.*, law firm records) that are legally controlled by the firm rather than the client. *See, e.g.*, *In re Klein*, 776 F.2d 628 (7th Cir. 1985).

route remains open in this instance and there is no need for us to allow a *Perlman* appeal.

E.  Jurisdiction over Appeal from the District Court's June Order

We do, however, have jurisdiction to hear ABC Corp.'s appeal of the District Court's June Order. The contempt route is not open to ABC Corp. because the subpoena and subsequent Order were directed solely at the three former ABC Corp. in-house attorneys. There is also no basis to believe that these former employees are anything but disinterested third parties who are unlikely to stand in contempt to vindicate ABC Corp.'s alleged privilege. Recognizing these facts, the Government does not argue that the contempt route remains open to ABC Corp., relying instead on its argument that *Mohawk* precludes a privilege holder who is a grand jury subject from appealing under *Perlman*. As explained above, we decline to hold that *Mohawk* so narrows *Perlman*. Accordingly, we reach the merits of this appeal with one exception.

In its June Order, the District Court rejected ABC Corp.'s request to issue an order requiring the Government to allow ABC Corp. to preview the questions that the Government intended to ask the in-house counsel before the grand jury. ABC Corp. does not argue that the District Court's refusal to allow it to preview these questions—a ruling based primarily on the Court's determination that there was no compelling necessity to justify breaking the seal of secrecy normally afforded to grand jury investigations—is independently appealable prior to a final decision on the merits. Instead, it asks us to consider this ruling in the course of deciding its substantive privilege claims on the theory that its inability to preview the questions prevented it from effectively defending its privileges.

28

ABC Corp. has not cited, and we have not found, any case where we have considered this sort of ancillary due process issue in the course of hearing substantive privilege claims on a *Perlman* appeal. We have, to be sure, previously considered other procedural issues—such as whether a district court erred in refusing to order the Government to disclose its *ex parte* affidavit supporting application of the crime-fraud exception, *In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir. 2000), and whether a district court erred in holding a hearing *ex parte* to determine the reasonableness of a subpoena, *In re Grand Jury*, 103 F.3d 1140, 144–45 (3d Cir. 1997)—in the course of deciding a *Perlman* appeal. These procedural questions, however, were closely tied to the substantive issues raised on appeal. They concerned the disclosure of evidence underlying the challenged district court ruling or the method employed to test the sufficiency of that evidence. The question presented here—whether ABC Corp.'s defense of its privilege was hindered by being denied the opportunity to preview grand jury questions—is significantly more tangential to the substantive privilege issues resolved by the District Court.[17]

---

[17] To the extent ABC Corp. is arguing that the District Court erred in choosing not to evaluate ABC Corp.'s privilege claims on a question-by-question basis—an issue over which we would have jurisdiction because it goes to the District Court's reasoning in evaluating the challenged privilege ruling—we are unconvinced that the Court erred. It engaged in a detailed analysis of the crime-fraud exception and whether it applied to the witnesses' testimony. Although courts often analyze privilege issues on a question-by-question basis, there is no support for ABC Corp.'s suggestion that the Court's analysis was somehow deficient solely because it chose not to do so.

As the Supreme Court reiterated in *Mohawk*, Congress has shown a preference that the appealability of decisions under § 1291 be determined through the rulemaking process rather than through court decision. *Mohawk*, 130 S. Ct. at 609 "Specifically, Congress in 1990 amended the Rules Enabling Act to authorize th[e] [Supreme] Court to adopt rules defin[ing] when a ruling of a district court is final for the purposes of appeal under section 1291. . . . These provisions . . . warrant the Judiciary's full respect." *Id.* (alteration omitted) (quotation marks and citations omitted).

Because we derive our jurisdiction from Congress's exercise of its authority to "ordain and establish" inferior courts, U.S. Const., Art. III, § 1, we are obliged to defer to Congress in this context. In addition, declining to expand our jurisdiction through court decision reflects an understanding of our institutional limitations in accurately predicting the effect that jurisdictional rules will have on judicial economy—an interest that is particularly important in the grand jury context. For these reasons, we decline to exercise jurisdiction over this ancillary procedural issue.

## IV. Merits

### A. Crime-Fraud Exception: Quantum of Proof

"Though they both operate to protect information from discovery, the work-product doctrine and the attorney-client privilege serve different purposes." *In re Chevron Corp.*, 633 F.3d 153, 164 (3d Cir. 2011). The attorney-client privilege protects from disclosure confidential communications made between attorneys and clients for the purpose of obtaining or providing legal assistance to the client. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007); *accord* Restatement (Third) of the Law Governing Lawyers § 68 (2000). Although such communications may be both relevant

and highly probative of the truth, we shield them from production in order "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

The work product doctrine, in contrast, "promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *In re Chevron Corp.*, 633 F.3d at 164 (quotation marks and citation omitted). It "protects from discovery materials prepared or collected by an attorney 'in the course of preparation for possible litigation.'" *In re Grand Jury Investigation*, 599 F.2d 1224, 1228 (3d Cir. 1979) (quoting *Hickman v. Taylor*, 329 U.S. 495, 505 (1947)).

Despite their importance, the protections afforded by the attorney-client privilege and the work product doctrine are not absolute. The Supreme Court has explained that the crime-fraud exception is one limit on the scope of the protection afforded by the attorney-client privilege.

> The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—ceases to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing.

31

*United States v. Zolin*, 491 U.S. 554, 562–63 (1989) (quotation marks, alterations, and citations omitted). We have held that this exception also applies to the work product doctrine. "The work product privilege is perverted if it is used to further illegal activities as is the attorney-client privilege, and there are no overpowering considerations in either situation that would justify the shielding of evidence that aids continuing or future criminal activity." *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979).

To circumvent these privileges under the crime-fraud exception, the party seeking to overcome the privilege—in this case, the Government—"must make a prima facie showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud." *In re Grand Jury Subpoena*, 223 F.3d at 217 (citations omitted). The "prima facie" standard is drawn from the Supreme Court's decision in *Clark v. United States*, 289 U.S. 1 (1933).

> There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. But this conception of the privilege is without support in later rulings. It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud. To drive the privilege away, there must be something to give colour to the charge; there must be prima facie evidence that it has some foundation in fact.

32

> When that evidence is supplied,
> the seal of secrecy is broken.

*Id.* at 15 (quotation marks and citations omitted).

While there is general agreement on these precepts, courts of appeals are divided as to the appropriate quantum of proof necessary to make a *prima facie* showing. This is not surprising. "'Prima facie' is among the most rubbery of all legal phrases; it usually means little more than a showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome." *In re Grand Jury Proceedings*, 417 F.3d 18, 22–23 (1st Cir. 2005) (citing Black's Law Dictionary 1228 (8th ed. 2004); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

When the Supreme Court last addressed the crime-fraud exception, it did little to clarify the necessary evidentiary showing. Because it is difficult to determine whether a document contains communications used in furtherance of a crime or fraud, courts sometimes review the allegedly privileged materials *in camera* to decide whether the crime-fraud exception applies to preclude the privilege. The Supreme Court affirmed the permissibility of that practice in *Zolin* so long as there is independent evidence "sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability." 491 U.S. at 574–75. The Court indicated that this is a "lesser evidentiary showing" than is "required ultimately to overcome the privilege," *id.* at 572, but declined to address the amount of proof that is ultimately required, *id.* at 563.

Courts of appeals have articulated the proper measure of proof in different ways. Some require there to be probable cause or a reasonable basis to suspect or believe that the client

33

was committing or intending to commit a crime or fraud and that the attorney-client communications were used in furtherance of the alleged crime or fraud. *See In re Grand Jury Proceedings*, 417 F.3d at 23 & n.4; *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *United States v. Collis*, 128 F.3d 313, 321 (6th Cir. 1997); *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996). Other courts call for evidence sufficient to compel the party asserting the privilege to come forward with an explanation for the evidence offered against the privilege. *See United States v. Boender*, 649 F.3d 650, 655–56 (7th Cir. 2011); *In re Grand Jury Subpoena*, 419 F.3d 329, 336 (5th Cir. 2005). Still other courts demand a showing of evidence that, if believed by a trier of fact, would establish that some violation was ongoing or about to be committed and that the attorney-client communications were used in furtherance of that scheme. *See In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007); *In re Grand Jury Proceedings #5 Empanelled January 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005); *In re Grand Jury Investigation*, 842 F.2d 1223, 1226–27 (11th Cir. 1987).

Our own statement of the proof necessary to apply the crime-fraud exception is not particularly helpful. We have consistently expressed the amount of proof required as follows: "A 'prima facie showing' requires presentation of 'evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.'" *In re Grand Jury Subpoena*, 223 F.3d at 217 (quoting *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 95–96 (3d Cir. 1992)). This begs the quantum-of-proof question because it does not quantify what evidence is sufficient. For example, does the trier of fact have to find that there is probable cause to believe a crime or fraud occurred or that it is more likely than not a crime or fraud occurred?

34

The question of what proof we require to overcome evidentiary privileges arises in this appeal. Although the District Court cited our traditional "sufficient to support" language, it also concluded that the Government had met its burden by establishing that there was a "reasonable basis to suspect" that ABC Corp. had committed a crime or fraud. ABC Corp. urges us to disavow this "reasonable basis to suspect" language, which it asserts reflects a far less stringent standard than our own "sufficient to support" test, and to remand this matter to the District Court so that it can analyze whether the Government met its burden under the appropriate standard.[18]

We have never held, however, that our crime-fraud standard was significantly more demanding than the standards set out by other courts of appeals. To the contrary, we have cited approvingly the Seventh Circuit Court's pronouncements that a party opposing the privilege meets its burden by introducing evidence sufficient to require the party asserting the privilege to come forward with an explanation, *In re Impounded*, 241 F.3d at 317 (citing *In re Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988)), and that "prima facie evidence cannot mean 'enough to support a verdict in favor of the person making the claim,'" *In re Grand Jury Investigation*, 445 F.3d 266, 275 (3d Cir. 2006) (quoting *In re Feldberg*, 862 F.2d at 624). We have also stressed that "[t]he burden is not a particularly heavy one," and that "demonstrating a reasonable basis to suspect the perpetration of a crime, if based on adequate evidence, satisfies the first prong of the crime-fraud exception." *Id.* at 274-75; *see also Haines*, 975 F.2d at 95 (approving the District Court's determination that

---

[18] We review legal conclusions—such as the amount of proof required to apply the crime-fraud exception—*de novo*. *In re Impounded*, 241 F.3d 308, 312 (3d Cir. 2001).

the "probable cause" formulation and the "sufficient to support" standard "amount to the same basic proposition").

Today, we clarify that our precedent is properly captured by the reasonable basis standard. The attorney-client privilege, work product doctrine, and crime-fraud exception are all compromises based on policy determinations. Although it is difficult to predict whether a particular standard of proof will strike the appropriate balance between these competing policy concerns, we believe, as do other circuit courts, that the reasonable basis standard affords sufficient predictability for attorneys and clients without providing undue protection to those that seek to abuse the privileges afforded to them. This is also the standard that we believe is closest to the Supreme Court's pronouncement that, for the crime-fraud exception to apply, "there must be something to give colour to the charge" that the attorney-client communication was used in furtherance of a crime or fraud. *Clark*, 289 U.S. at 15.

Where there is a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud, this is enough to break the privilege. The reasonable basis standard "is intended to be reasonably demanding; neither speculation nor evidence that shows only a distant likelihood of corruption is enough." *In re Grand Jury Proceedings*, 417 F.3d at 23. At the same time, the party opposing the privilege is not required to introduce evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred. *See id.* at 22; *In re Grand Jury Investigation*, 445 F.3d at 274–75. The reasonable basis standard is one with which courts are familiar, and we are confident that they will

36

be able to apply it consistently to achieve the policy objectives of the privileges and the crime-fraud exception.

Perhaps recognizing that our precedent is amenable to the reasonable basis standard articulated by the District Court, ABC Corp. asks us to "modify the standard to establish crime-fraud by requiring the government to demonstrate by a preponderance of the evidence that the privilege has been employed to commit a crime or fraud." Appellants' Br. at 60.

The Supreme Court's decision in *Bourjaily v. United States*, 483 U.S. 171 (1987), provides some support for use of the preponderance-of-the-evidence standard. Federal Rule of Evidence 104(a) requires courts to "decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." In *Bourjaily*, the Supreme Court held that factual predicates needed to determine the admissibility of hearsay evidence under Rule 801(d)(2)(E) must be established by a preponderance of the evidence.[19] *See* 483 U.S. at 175–76. Because Rule 104(a) also applies to preliminary factual determinations underlying application of the crime-fraud exception, s*ee Zolin*, 491 U.S. at 565, it could be inferred that the same preponderance standard applies to these determinations.

*Bourjaily*, however, does not dictate that we apply a preponderance-of-the-evidence standard in our case. The Supreme Court there was not interpreting the language of

---

[19] When *Bourjaily* was decided, Rule 104(a) provided in pertinent part: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . ." The Rule was amended as part of the restyling of the Federal Rules of Evidence in 2011.

Rule 104(a) or any other provision of the Federal Rules of Evidence. Instead, because "[t]he Federal Rules . . . nowhere define the standard of proof the court must observe in resolving these questions," the Supreme Court was "guided by [its] prior decisions regarding admissibility determinations that hinge on preliminary factual questions." *Bourjaily*, 483 U.S. at 175. We are guided by the same inquiry here.

Neither our own nor Supreme Court precedent suggests that a preponderance-of-the-evidence standard is necessary to protect the policy concerns underlying the crime-fraud exception. To the contrary, we have found that these policy concerns, which differ from those attending evidentiary admissibility, are appropriately protected by a lower standard. This is particularly true in the grand jury context, where the need for speed, simplicity, and secrecy weighs against imposing a crime-fraud standard that would require adversarial hearings or the careful balancing of conflicting evidence.[20] *See In re Impounded*, 241 F.3d at 313 ("'Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and

---

[20] The Ninth Circuit has held that the preliminary factual determinations necessary for application of the crime-fraud exception should be determined by a preponderance of the evidence in the civil litigation context. *See In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1094–95 (9th Cir. 2007), *abrogated on other grounds by Mohawk*, 558 U.S. 100, 130 S. Ct. 599 (2009). But that Court made clear that it would continue to apply its "reasonable cause" standard to grand jury investigations. *Id.* at 1094. We suggest here no view as to whether a higher standard should be applied in the civil litigation context.

expeditious administration of the criminal laws.'" (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1973)); *In re Napster*, 479 F.3d at 1094-95 ("[C]ourts of appeal have noted that the need for speed and simplicity at the grand jury stage weighs against a crime-fraud standard that requires courts to hear testimony or to determine facts from conflicting evidence before making a crime-fraud determination." (quotation marks and citations omitted)). Accordingly, we do not adopt a preponderance-of-the-evidence test as the proof necessary to apply the crime-fraud exception.

B. Crime-Fraud Exception: Satisfaction of Government's Burden

ABC Corp. asserts that, regardless of the proof required, the District Court erred in determining that the Government satisfied its burden. As just discussed, a party seeking to apply the crime-fraud exception must demonstrate that there is a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud. We review the District Court's decision that "there is sufficient evidence of a crime or fraud to waive the attorney-client privilege" for "abuse of discretion." *In re Impounded*, 241 F.3d at 318 (citations omitted). We review factual determinations underlying that decision for clear error. *Id.* at 312.[21]

---

[21] ABC Corp. requests that we change our standard of review to *de novo* for all factual issues underlying application of the attorney-client privilege, work product doctrine, and crime-fraud exception. As the Government points out, and ABC Corp. accepts in its Reply Brief, we are bound by our own

## 1. *Commission of a Crime or Fraud*

The District Court found that the evidence submitted *ex parte* by the Government provided a reasonable basis to suspect that ABC Corp. willfully evaded paying federal income taxes in violation of 26 U.S.C. § 7201 and engaged in a conspiracy to defraud the United States of federal income taxes in violation of 18 U.S.C. § 371.[22] This scheme, which

---

precedent unless it has been overruled by Supreme Court decision or we are sitting *en banc*. *In re Lemington Home for the Aged*, 659 F.3d 282, 294 n.6 (3d Cir. 2011). Moreover, we voice no opinion on whether the standard of review should be changed.

[22] Under 26 U.S.C. § 7201, "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony." To establish a violation of § 7201, the government must prove "(1) willfulness, (2) the existence of a tax deficiency, and (3) an affirmative act constituting an evasion or attempted evasion of the tax." *United States v. Hecht*, 638 F.2d 651, 659 (3d Cir. 1981) (Weis, J., dissenting) (citing *Sansone v. United States*, 380 U.S. 343, 351 (1965)). Under 18 U.S.C. § 371, "[i]f two or more persons conspire to . . . defraud the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined . . . or imprisoned . . . or both." In order to prove a conspiracy to defraud the United States, the evidence must establish "(1) an agreement to defraud the United States, (2) an overt act by one of the conspirators in furtherance of that objective, and (3) any conspirator's commission of at least one overt act in furtherance of the conspiracy." *United States*

occurred between 2004 and 2006, unfolded in two phases.  In the acquisition phase, ABC Corp. acquired the stock of closely held companies.  The target companies generally had large cash accounts, few or no tangible assets, and considerable tax liabilities.  In the disposition phase, ABC Corp. would remove significant amounts of the target companies' cash assets, transfer the stock of the target companies to two limited liability companies, and engage in various transactions that had the effect, it is alleged, of fraudulently eliminating the target companies' tax liability.  Having done so, John Doe 1 and John Doe 2 would then divert the target companies' cash assets to themselves and their family members.

Our discussion of the District Court's findings is necessarily abridged because of the secrecy of grand jury proceedings.  As noted, we received unredacted versions of the District Court's March and June Orders and *ex parte* submissions from the Government.  Having reviewed these materials, we cannot say that the District Court's detailed factual findings constituted clear error or that it abused its discretion in determining that there was a reasonable basis to suspect that ABC Corp. was engaged in a criminal scheme.[23]

---

*v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007) (citing *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989)).

[23] ABC Corp. argues that the District Court erred in declining to hold a hearing and in refusing to require the Government to disclose some or all of its *ex parte* submissions to ABC Corp.  Because grand juries are investigative rather than adversarial bodies, and because of the need for secrecy, we have generally held that district courts have considerable discretion to select among "various avenues of inquiry" in the grand

ABC Corp. cites four recent decisions of the United States Tax Court in support of its assertion that the District Court mistakenly found that the Government satisfied its burden in establishing that ABC Corp. committed a crime or fraud. *See Slone v. Comm'r*, 103 T.C.M. (CCH) 1265 (2012); *Frank Sawyer Trust v. Comm'r*, 102 T.C.M. (CCH) 623 (2011); *Starnes v. Comm'r*, 101 T.C.M. (CCH) 1283 (2011),

---

jury context. *In re Grand Jury Subpoena*, 223 F.3d at 219; *see also id.* ("We today join the ranks of our sister circuits in holding that it is within the district courts' discretion, and not violative of due process, to rely on an *ex parte* government affidavit to determine that the crime-fraud exception applies and thus compel a target-client's subpoenaed attorney to testify before the grand jury."); *In re Grand Jury Empaneling of Special Grand Jury*, 171 F.3d 826, 833-34 (3d Cir. 1999) ("Neither Supreme Court precedent nor our prior decisions require that a hearing be held whenever a subpoena is challenged on reasonableness grounds. Indeed, this court has specifically rejected any such suggestion, leaving the decision to hold a hearing to the district court's discretion."). The District Court refused to require the Government to disclose its *ex parte* submissions because they contained secret grand jury information and declined to hold a hearing because the Court did not think it would be useful given the parties' divergent access to the relevant evidence. Instead, it granted ABC Corp. access to redacted versions of the Government's briefing, provided ABC Corp. with the opportunity to make its own submissions, and conducted a careful and probing *in camera* review of the parties' evidentiary submissions. We cannot say that the Court abused its discretion, or denied ABC Corp. due process, in determining the applicability of the crime-fraud exception on this basis.

*aff'd*, 680 F.3d 417 (4th Cir. 2012); *Griffin v. Comm'r*, 101 T.C.M. (CCH) 1274 (2011). In each of these cases, the Tax Court held that company shareholders were not liable for tax deficiencies incurred by their respective companies after they were sold to third parties. ABC Corp. argues that it is in the same position as the selling shareholders in *Slone*, *Frank Sawyer Trust*, *Starnes*, and *Griffin*, and thus cannot be responsible for the allegedly fraudulent transactions that occurred after it sold the target companies.

We do not agree that these decisions preclude application of the crime-fraud exception. As an initial matter, the District Court and the Tax Court applied different statutory provisions in distinct contexts. The latter determined whether the shareholders could be held liable as transferees under 26 U.S.C. § 6901—which requires application of substantive state law—for tax deficiencies incurred after the sale of the relevant company. The District Court, in contrast, analyzed whether there was a reasonable basis to suspect that ABC Corp. willfully evaded paying federal income taxes in violation of 26 U.S.C. § 7201 and engaged in a conspiracy to defraud the United States of federal income taxes in violation of 18 U.S.C. § 371.

In addition, the Tax Court's decisions depended on fact-specific analyses—which included detailed reviews of the transactions at issue, the roles of the shareholders, and their knowledge of the fraudulent transactions. We are limited in our ability to discuss the facts of the alleged criminal scheme that the grand jury is investigating. But it will not disclose too much for us to say that the Government's submissions provide sufficient support for the inference that ABC Corp. played a considerably different role in the alleged criminal scheme than the shareholders in *Slone*, *Frank Sawyer Trust*, *Starnes*, and *Griffin* played in those transactions.

43

2. *Use of Attorney Advice in Furtherance of the Crime or Fraud*

On the basis of its crime-fraud finding, the District Court ordered the three in-house counsel to answer all questions concerning transactions involving companies that ABC Corp. purchased and subsequently transferred to the two limited liability companies implicated in the alleged criminal scheme.[24] Although the fraudulent tax transactions took place in the disposition phase, the District Court determined that the acquisition phase was also an essential component of the alleged criminal scheme. The alleged purpose of the criminal enterprise was to divert large sums of money to John Doe 1, John Doe 2, and their relatives. Acquiring cash-rich targets with large tax liabilities was therefore a necessary precursor to achieving that objective. Accordingly, the District Court ordered the in-house counsel to answer questions regarding all phases of the transactions.

We do not think that the District Court's factual findings were clear error or that it abused its discretion in determining that there is a reasonable basis to suspect that ABC Corp. used the legal advice it obtained in connection with these transactions to further its criminal scheme. For the crime-fraud exception to apply, the attorney does not have to be implicated in the crime or fraud or even have knowledge of the alleged criminal or fraudulent scheme. *In re Grand Jury Investigation*, 445 F.3d at 279 n.4. All that is necessary is that the client misuse or intend to misuse the attorney's

---

[24] The District Court also determined that the crime-fraud exception vitiated any privilege ABC Corp. had over a 2004 opinion letter that ABC Corp. obtained from outside counsel. The District Court's ruling with respect to this document is addressed below. *See infra* Part IV.D.1.

advice in furtherance of an improper purpose. *Id.* at 279–80. When this occurs, the purpose of the privilege, to promote the fair administration of justice, has been undermined and the privilege no longer applies. *Id.*

The District Court found that there is a reasonable basis to suspect that ABC Corp. was engaged in a large-scale criminal scheme that consisted of multiple phases. Although ABC Corp. suggests that there is no evidence implicating its former in-house counsel in the allegedly fraudulent transactions that occurred in the disposition phase of the scheme, because it is the criminal intent of the client and not its attorneys that matters, it is irrelevant whether the in-house counsel were only engaged in the scheme's initial phases. If the acquisition phase was a critical component of the criminal enterprise (as the District Court found), any legal advice that ABC Corp. obtained to further those acquisitions was used for an improper purpose and is not entitled to any protection otherwise afforded by the attorney-client privilege or work product doctrine.

In an effort to undermine the District Court's rulings, ABC Corp. asserts that it presented evidence to the District Court demonstrating that the in-house counsel's legal services were not used in furtherance of any crime or fraud. Specifically, ABC Corp. points to sworn declarations of one of the in-house counsel and John Doe 1 purportedly "demonstrat[ing] that there were no circumstances where [ABC Corp.] consulted an attorney and then engaged in a course of action that was fraudulent or criminal." Appellants' Br. at 65.

These declarations do not alter our conclusion that the District Court did not commit reversible error. Although the in-house counsel testified that he provided a variety of legal services for ABC Corp. in connection with its acquisition of

45

closely held corporations, he did not indicate one way or the other whether he believed these transactions were part of a larger criminal scheme. In any event, even if he were entirely ignorant of such a scheme, this would not put the crime-fraud exception out of play.

The declaration of John Doe 1 is equally unpersuasive. He testified that, to the best of his knowledge, information, and belief, ABC Corp. never sought advice from an attorney that was then used to commit a crime or a fraud. While this evidence is not necessarily irrelevant, the District Court was hardly required to credit this bald statement of innocence from a grand jury subject or to determine that it outweighed the substantial evidence submitted by the Government.

C. <u>Application of Crime-Fraud Exception to the Work Product Doctrine</u>

ABC Corp. asserts that even if the District Court was correct in applying the crime-fraud exception to strip the protection conferred by the attorney-client privilege, the exception does not affect the cover conferred by the work product doctrine because there is no evidence that the attorneys knew of the alleged criminal scheme.

We have left open the possibility that "there may be circumstances in which [an] attorney, without knowledge of his client's illegal activity, might . . . properly claim and prevail in asserting a work product privilege" even when his client cannot. *In re Grand Jury Proceedings*, 604 F.2d at 802 n.5. Because the work product doctrine protects the interests of attorneys separately from the interests of clients, there is at least some basis for the proposition that an innocent attorney should be able to prevent disclosure of work product that his client used to further a crime or fraud. Accordingly, other courts of appeals have afforded attorneys this protection in

appropriate circumstances.  *See, e.g.*, *In re Green Grand Jury Proceedings*, 492 F.3d 976, 980 (8th Cir. 2007); *In re Grand Jury Proceedings #5*, 401 F.3d at 252–53.

We continue, however, to leave for another day whether we should join these courts.  None of the in-house counsel has appealed the District Court's June Order.  Indeed, the in-house counsel would likely need to disobey that Order for us to have jurisdiction over their purported work product claims.  In the absence of their doing so, we cannot properly assess the existence and parameters of their independent interests in resisting disclosure of information.

D.  The District Court's Document Rulings

ABC Corp. challenges the District Court's rejection of its privilege claims with respect to five documents in the possession of ABC Corp.'s former in-house counsel.  As noted, we review legal issues underlying the application of the attorney-client privilege or work product doctrine *de novo* and review factual findings underlying the application of these privileges for clear error.  *In re Chevron Corp.*, 633 F.3d at 161.

1. *Two Copies of Opinion Letter Prepared by ABC Corp.'s Outside Counsel*

This document is a 2004 opinion letter prepared by ABC Corp.'s outside counsel relating to the allegedly fraudulent transactions investigated by the grand jury. Two of the in-house counsel are in possession of this document. The only difference between the copies in their possession is that one includes handwritten notes. The District Court determined that any protection afforded by the attorney-client privilege or work product doctrine to the opinion letter was extinguished by the crime-fraud exception.

ABC Corp. raises two challenges to this ruling. First, it argues that the District Court erred in reversing its previous ruling rejecting the Government's claim that the opinion letter was used in furtherance of the alleged tax crimes. In its March Order, the Court ruled that the Government failed to carry its burden of introducing *prima facie* evidence that the opinion was used in furtherance of the alleged tax crimes. Specifically, the Court found there was no evidence that the letter was scripted to provide ABC Corp.'s principals with legal support to defend the allegedly fraudulent transactions if they were later questioned by the authorities. In its June Order, the Court changed its ruling on the basis of evidence newly obtained by the Government—an interview memorandum it submitted *ex parte* and under seal. Though we are unable to discuss the content of this witness summary, we have reviewed it and see no abuse of discretion in the Court's determination that it provides a reasonable basis to suspect that ABC Corp. used the legal advice contained in the opinion letter to further the alleged criminal tax scheme.

Second, ABC Corp. claims that the handwritten notes on one of the copies of the opinion letter should be protected from disclosure as attorney work product because no

evidence exists implicating the author of the note—presumably the counsel—in the alleged criminal scheme. As ABC Corp. never raised this issue before the District Court, it has waived the opportunity to raise it on appeal. *See United States v. Williams*, 510 F.3d 416, 430 (3d Cir. 2007); *Franki Found. Co. v. Alger-Rau & Assocs., Inc.*, 513 F.2d 581, 586 (3d Cir. 1975). Moreover, as we have already noted, the in-house counsel have not appealed the District Court's June Order.

### 2. *Email Chain Containing Communications Between ABC Corp.'s Outside Counsel and a Target Company's Outside Counsel*

This document is an email chain. The first message in the chain is between outside counsel representing ABC Corp. and outside counsel representing one of the target companies it purchased. In this message, counsel for the target company (1) asks where to transfer certain business records, including records pertaining to patents, of the target corporation, (2) asserts that the target company was not required to undertake any maintenance responsibilities related to those patents, and (3) inquires whether outside counsel prepared a transaction binder related to the purchase. The second message in the chain is between ABC Corp.'s outside counsel and one of ABC Corp.'s former in-house counsel. In that message, the outside counsel forwards the first email with the request to "[p]lease see . . . email below. Per my voicemail, please advise me as to what you would like us to do." Because the in-house counsel was no longer employed by ABC Corp., the remainder of the chain consists of communications discussing with whom at ABC Corp. the outside counsel could communicate about the matter. The District Court determined that none of these communications was protected by the attorney-client privilege.

As we have explained, that privilege

> applies to any communication that satisfies the following elements: it must be "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." "Privileged persons" include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation.

*In re Teleglobe*, 493 F.3d at 359 (quoting Restatement (Third) of the Law Governing Lawyers §§ 68, 70 (2000)).[25] "To the extent that the record is ambiguous as to the elements which are necessary to establish the claim of privilege, 'the burden of proving that the attorney-client privilege applies is placed upon the party asserting the privilege.'" *In re Grand Jury Empanelled February 14, 1978*, 603 F.2d 469, 474 (3d Cir.

---

[25] *See also In re Impounded*, 241 F.3d at 316 n.6 ("Communications are protected under the attorney-client privilege when: (1) legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection [may] be waived." (citation omitted)).

1979) (alterations omitted) (quoting *United States v. Landof*, 591 F.2d 36, 38 (9th Cir. 1978)).

The second email in the chain contains the only communication that is arguably privileged. According to ABC Corp., this email "plainly involves a request for legal advice" because "one attorney is asking the other attorney how to prepare for one of the acquisitions at issue." Appellants' Reply at 27 (Sept. 10, 2012). We disagree. It is at best ambiguous whether the communication is a request for legal advice (*e.g.*, how ABC Corp. wants to respond to the target company's assertion that it is not responsible for maintaining certain patents) or is a purely administrative request (*e.g.*, where the business records should be transferred and whether a binder has been made). Because ABC Corp. bears the burden of demonstrating that the privilege applies, and it has provided no support for its assertion that this was a request for legal advice, we cannot say that the District Court erred in finding that this email lacks a privilege protection.

### 3. *Two Documents Containing Communications Between John Doe 1 and ABC Corp.'s In-House Counsel*

These documents contain communications between one of ABC Corp.'s former in-house counsel and John Doe 1 pertaining to matters involving the wind-up of ABC Corp.'s affairs. ABC Corp. argues that they "do not pertain to any specific transaction engaged in by [ABC Corp.] during its operations and therefore cannot be considered to be in furtherance of any crime or fraud." Appellants' Br. at 72. Whatever the merits of this argument, the District Court did not order disclosure of the documents on the basis of its crime-fraud ruling, but rather because of its determination that the communications do not contain legal advice protected by the attorney-client privilege. ABC Corp. does not make

any argument why this ruling was incorrect, and, even absent this waiver, we see none. We accordingly affirm the District Court's ruling as to these two documents.

## V.    Conclusion

We summarize our holdings.

1.    ABC Corp. has standing to contest the grand jury subpoenas because it claims privilege in the sought-after documents and testimony. John Doe 1 and John Doe 2, in contrast, lack standing because they are not privilege holders, and do not have any other legally cognizable interest in the documents or testimony.

2.    Even though ABC Corp. has standing, we lack jurisdiction to hear its appeal from the March Order because ABC Corp. may travel the well-worn contempt path to jurisdiction. If ABC Corp. wishes to appeal this Order immediately, it must take possession of its documents from Blank Rome, refuse to produce them to the Government, and appeal any resulting contempt sanctions. Because the parties have been unable to agree on a mechanism for transferring the documents, we lift the stay to allow the District Court to effect an appropriate transfer. In doing so, the Court, if it wishes, may designate a representative of ABC Corp. to receive delivery of the documents or direct ABC Corp. to do so.

3.    We have jurisdiction to hear the appeal by ABC Corp. from the June Order because that Order is not directed to it and its former employees are unlikely to risk contempt sanctions on its behalf. Contrary to the Government's suggestion, we decline to hold that the Supreme Court's decision in *Mohawk Industries, Inc. v. Carpenter*, 558 U.S.

100, 130 S. Ct. 599 (2009), precludes *Perlman* appeals by grand jury subjects.

4. Finally, in reaching the merits of ABC Corp.'s appeal from the June Order, we hold that the Court correctly (a) applied the crime-fraud exception to deny ABC Corp. a privilege protection over testimony and two documents sought from its former in-house counsel and (b) determined that three documents sought from those counsel do not qualify as privileged.

In this context, we dismiss the appeals by John Doe 1 and John Doe 2 for lack of standing, dismiss the appeal by ABC Corp. from the March Order for lack of jurisdiction, and affirm the June Order.[26]

---

[26] For the sake of judicial economy, we have directed the Clerk to assign to this panel any further appeals in this matter.

VANASKIE, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the majority that John Doe 1 and John Doe 2 lack standing to challenge on the basis of the attorney-client privilege or work product doctrine the District Court's disclosure orders, because neither individual can claim the protection of either exemption from disclosure. I also agree that we lack jurisdiction to review the District Court's March 2012 Order (the "March Order") to the extent that it requires production directly by ABC Corporation ("ABC"), because ABC may obtain appellate jurisdiction over that portion of the March Order by refusing to produce the contested documents and standing in contempt. [1] I also am in complete accord with the majority's holdings that we do have jurisdiction over ABC's appeal from the District Court's June 2012 Order (the "June Order"), which compels former in-house counsel of ABC to produce certain documents claimed to be protected from disclosure by ABC because the former in-house lawyers have no stake in the controversy sufficient to prompt them to risk contempt of court sanctions, and the only recourse available to ABC is a direct appeal of the June Order. Finally, I agree that the District Court correctly applied the crime-fraud exception to the attorney-client privilege in ordering production of certain documents by former in-house counsel. I write separately, however, because I believe that we have jurisdiction over ABC's appeal from the March

---

[1] ABC argues that the District Court included ABC in its order by mistake and that the District Court intended to require production only by the law firms. I agree with the majority, however, that if ABC wishes to make this argument on appeal, it must first stand in contempt.

Order to the extent that it requires production by ABC's outside lawyers – Blank Rome LLP ("Blank Rome") and LaCheen, Wittels & Greenberg, LLP ("LaCheen Wittels"). I would instead reach the merits of both Orders, and I would affirm the District Court to the extent it ordered production of the documents in question by both outside and former in-house counsel.

## I.      Jurisdiction

### A. The *Perlman* Doctrine

As discussed in the majority's opinion, a witness ordered to produce documents before a grand jury may not ordinarily bring an interlocutory appeal challenging the order requiring production. *See In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d 798, 800 (3d Cir. 1979). To obtain review, the witness must instead stand in contempt and appeal the contempt order. *Id.*

The Supreme Court, however, carved out an exception, known as the *Perlman* doctrine, permitting privilege holders to bring interlocutory appeals of orders requiring production by third-party custodians. *See Perlman v. United States*, 247 U.S. 7, 15 (1918); *see also In re Grand Jury Proceedings (Cianfrani)*, 563 F.2d 577, 580 (3d Cir. 1977); *In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d at 800; *In re Grand Jury*, 111 F.3d 1066, 1076-77 (3d Cir. 1997); *In re Grand Jury*, 286 F.3d 153, 157 (3d Cir. 2002). The *Perlman* doctrine rests on the premise that a non-subpoenaed privilege holder does not have the option of standing in contempt to obtain jurisdiction over an order directing production by a third-party custodian, because the order is not directed to the

2

privilege holder. *See In re Grand Jury (C. Schmidt & Sons, Inc.)*, 619 F.2d 1022, 1024-25 (3d Cir. 1980); *In re Grand Jury*, 111 F.3d at 1077. Moreover, a third-party custodian in possession of subpoenaed documents will more likely comply with a district court's order than stand in contempt to protect the privilege holder's rights. *See In re Grand Jury Proceedings (Cianfrani)*, 563 F.2d at 580. Because the privilege holder cannot stand in contempt or force the third-party custodian to stand in contempt, the privilege holder becomes effectively "powerless to avert the mischief of the [district court's] order." *Perlman*, 247 U.S. at 13. To prevent this result, we have held that a district court order requiring production by a third-party custodian is final as to the privilege holder, and permit the privilege holder to take immediate appeal pursuant to 28 U.S.C. § 1291. *See In re Grand Jury (C. Schmidt & Sons, Inc.)*, 619 F.2d at 1025 ("[W]hen a party, other than the one to whom a subpoena has been addressed, moves to quash the subpoena, the denial of his motion disposes of his claim fully and finally.") (citations omitted).

Applying the logic of *Perlman* to this appeal, I agree with the majority that ABC cannot appeal the portion of the District Court's March Order requiring ABC itself to produce the documents directly. ABC is an ordinary subpoenaed party, rather than a privilege holder challenging production by a third-party, with respect to the portion of the District Court's March Order requiring that it produce certain documents. It must therefore stand in contempt to confer jurisdiction over this part of the District Court's order. *See In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d at 800.

3

In my view, however, the portions of the District Court's March Order requiring production by the law firms are a different matter. With respect to the portions concerning the law firms, ABC is the purported privilege holder challenging a district court order requiring production by third-party custodians. ABC cannot stand in contempt of the District Court's order as to the law firms, because that part of the order is not directed to ABC. *See In re Grand Jury (C. Schmidt & Sons, Inc.)*, 619 F.2d at 1024-25. ABC is thus more or less in the same position as were the privilege holders in the long line of cases in which we have applied the *Perlman* doctrine – ABC's only effective recourse is a direct appeal of the order requiring third-party custodians to produce purportedly privileged records. Indeed, I see no meaningful distinction between the March and June Orders to the extent that they both compel production of purportedly privileged documents in the custody of parties other than ABC.

B. Effect of the Order Against ABC Corporation

The majority distinguishes this appeal principally on the grounds that both the law firms and ABC are subject to the District Court's order requiring production. Therefore, in the majority's view, ABC can obtain immediate appellate review by demanding that the law firms return the documents to it and by incurring a contempt sanction. The majority's argument rests, in part, on its assertion that if ABC can appeal under *Perlman*, then any client will be able to bring an interlocutory appeal by giving its documents to its law firm.

I cannot agree with the majority's logic. The purpose of the *Perlman* doctrine is to enable a privilege holder to

4

appeal an order requiring production when he or she "'lacks the opportunity to contest the subpoena by disobedience because it is not directed to him or her.'" *In re Grand Jury*, 111 F.3d at 1077 (quoting *In re Grand Jury Matter (Dist. Council 33 Health & Welfare Fund)*, 770 F.2d 36, 38 (3d Cir. 1985)). That is exactly the situation that we now face with respect to the orders compelling production of the contested documents by the law firms. Because Blank Rome, rather than ABC, has physical custody of the documents, ABC cannot unilaterally stand in contempt. Regardless of ABC's intent to stand in contempt, Blank Rome can comply with the District Court's order and produce the documents.

I disagree that ABC has the option of obtaining jurisdiction by taking physical custody of the documents and refusing to produce them to the Government. Although the majority rules out the possibility of the Government charging the law firms with obstruction of justice, it cannot rule out the possibility that the District Court will hold the law firms in contempt. The Government subpoenaed the law firms individually and moved to compel them to produce the documents. The District Court issued an order requiring production by the law firms directly. Transferring the documents to ABC will not negate the law firms' duty to comply with the District Court's order. *See Couch v. United States*, 409 U.S. 322, 329 n.9 (1973) ("The rights and obligations of the parties bec[o]me fixed when [a] summons [is] served, and [a post-summons document] transfer [does] not alter them.") (citations omitted); *In re Grand Jury Empanelled*, 597 F.2d 851, 865 (3d Cir. 1979) (holding that an employer cannot defeat a subpoena served on its employee by taking the requested documents from the employee and claiming that the documents are no longer in the employee's

5

possession); *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980) (stating that a recipient of a summons cannot defeat the summons by relinquishing possession of the requested documents); *United States v. Three Crows Corp.*, 324 F. Supp. 2d 203, 206 (D. Me. 2004) ("[T]he law does not allow a custodian of records to send [the requested documents] away after receiving a summons and then claim he cannot produce them, because they are no longer in his possession."). Accordingly, if the law firms ignore the District Court's order and instead turn over the documents to ABC, they will be just as much in contempt as ABC. *See Nilva v. United States*, 352 U.S. 385, 392 (1957) ("[A] criminal contempt is committed by one who, in response to a subpoena calling for corporation or association records, refuses to surrender them when they are in existence and within his control.") (citations omitted); Fed. R. Crim. P. 17(g) ("The court . . . may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district."); 28 U.S.C. § 1826(a) (authorizing civil contempt sanctions when "a witness . . . refuses without just cause shown to comply with an order of the court to testify or provide other information").

This matter was returned to the District Court with the understanding that the parties would be able to reach an agreement on a way to transfer the contested documents to ABC that would avoid the law firms being found in contempt. The inability of the parties to reach agreement on a mechanism for the transfer of the documents in question to the defunct corporation, coupled with the Government's unwillingness to forego contempt sanctions against the law firms, illustrates why jurisdiction should be found to exist in relation to the District Court directives requiring production

6

by the law firms. There is no effective mechanism to avoid the problem that *Perlman* resolves: the release of privileged documents by a disinterested custodian who is understandably unwilling to suffer contempt sanctions to protect a privilege held by another.

The Government's reluctance to agree to a document transfer is not surprising. The Government wants a meaningful contempt sanction, one that threatens an individual with imprisonment or hefty monetary penalties. But ABC is defunct and no individual has thus far appeared to take on the dubious responsibility of suffering contempt to protect the attorney-client privilege.

In large measure, the problem presented in this case is attributable to the fact that ABC, the privilege holder, is no longer active and has no person within the jurisdiction of the District Court to whom the documents can be transferred. It is not a sufficient answer to the conundrum created by the fact that ABC is defunct to place the matter in the very capable hands of the District Court and say you come up with "an appropriate mechanism for transferring the documents from Blank Rome to ABC Corp." (Majority Op., typescript at 23.) Nor is it sufficient to say that there must be some person who has decided to assert the privilege, and that person should be designated to receive the documents and suffer contempt sanctions. No such person within the jurisdiction of the District Court has yet been identified, and the Government certainly would not agree to a transfer of the documents to a person who is not subject to the District Court's jurisdiction. It is this inability to identify a person who could be held in contempt that makes the *Perlman* doctrine particularly applicable here.

Nor does the fact that the law firms are ABC's agents, and thus have a duty to return the documents to ABC upon ABC's demand, alter the result. Although I agree in general that a client can require his or her attorney to return documents, I disagree that ABC can do so in light of the District Court's order. A client generally cannot require his or her attorney to violate a district court order to protect his or her privilege. An attorney, after asserting all non-frivolous objections to producing client confidences, may ethically comply with a court order requiring production. *See* Model Rules of Prof'l Conduct R. 1.6(6) & cmt. 13 (2010); Pa. Rules of Prof'l Conduct R. 1.6 cmt. 19 (2012); *see also In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d 199, 202 (5th Cir. 1981) (stating that an attorney may ethically reveal client confidences pursuant to a court order). Because the District Court's order requires the law firms to produce the documents, ABC cannot force the law firms to instead return the documents to it.

Moreover, I disagree that applying *Perlman* when the privilege holder is also subject to the District Court's order will enable any client to take a *Perlman* appeal by turning over all documents to his or her attorney. As the majority agrees, the Government may request documents by subpoena that are subject to the subpoena recipient's legal control. *See In re Grand Jury*, 821 F.2d 946, 951 (3d Cir. 1987) ("A party's lack of possession or legal control over documents requested by a subpoena is normally a valid defense to a subpoena and justification for a motion to quash."). As the Government appears to agree, a client maintains control over documents that he or she turns over to his or her current attorney, because the client may ordinarily request the

documents' return. (Appellee's Br. 16) ("[T]he subjects [of the grand jury investigation] do not suggest that the privilege-holder corporation no longer has the ability to obtain its documents from [its lawyer]."); *see also Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d Cir. 2004) (holding that control under Fed. R. Civ. P. 34(a) is "the legal right or ability to obtain the documents from another source upon demand"). In the majority of future cases, the Government will be able to avoid a *Perlman* appeal by subpoenaing records solely from the privilege holder and obligating the privilege holder to request his or her attorney to produce the documents. *Perlman* jurisdiction exists in this instance because the Government chose to subpoena the law firms directly in possession of the documents, thereby subjecting them to possible contempt sanctions should they refuse to comply.

I am also concerned that the majority's rule will effectively eviscerate the *Perlman* doctrine in all instances where, as here, the privilege holder can direct the custodian to produce the subpoenaed documents, but cannot necessarily prevent the custodian from releasing the documents in the event a court orders production. In such cases, the Government will have every incentive to subpoena both the privilege holder and the custodian, obtain orders against both, and use the order against the privilege holder to artificially prevent the privilege holder from taking a *Perlman* appeal. Creating such a loophole, in my view, is inconsistent with our Court's interpretation of *Perlman* as enabling privilege holders to obtain jurisdiction when they cannot obtain jurisdiction by standing in contempt.

9

Finally, I am constrained to note that this jurisdictional puzzle involving a defunct corporation that has been subpoenaed to produce documents held by its law firms has tied this matter up for months. Notably, the June Order, because ABC is not subject to it, is immediately reviewable under *Perlman*, but the March Order is still unreviewable until procedural hurdles are surmounted. I believe, admittedly with the benefit of hindsight, that the Government has unwittingly caused a lengthy delay in the grand jury proceedings by trying to end-run the *Perlman* doctrine by having both the law firms and ABC be the subjects of the disclosure order. Interests of judicial economy and speedy grand jury investigations would have been better served had the Government not taken such a belt and suspender approach by subpoenaing both the privilege holder and its law firms, but instead had directed its subpoena only to the custodians of the records and allowed the *Perlman* doctrine full play with an adjudication on appeal of the privilege claims.

## C. Effect of Current Representation by the Law Firms

Finally, although not addressed by the majority, the Government argues that the *Perlman* doctrine does not apply in this instance because the law firms are not "[d]isinterested [t]hird [p]arties" due to their current representation of subjects of the grand jury investigation. (Appellee's Br. 15.) I believe that the *Perlman* doctrine applies to current attorneys and would reject this argument.

As an initial matter, our Court's interpretation of the *Perlman* doctrine does not require strict disinterest, at least in the sense of requiring total non-affiliation with the privilege holder. We have instead tended to focus our analysis on

whether the privilege holder "is in a position to control the [subpoenaed custodian's] decision whether to produce the records," and on whether the third-party's personal stake in the matter is substantial enough for it to likely stand in contempt to protect the privilege holder's rights. *In re Grand Jury Matter*, 802 F.2d 96, 99 (3d Cir. 1986); *see In re Grand Jury (C. Schmidt & Sons, Inc.)*, 619 F.2d at 1024-25 (holding that the privilege holder's employees are third-parties under *Perlman* because employees are unlikely to stand in contempt to protect their employer). Applying this framework, the majority and I agree that a privilege holder's *former* attorney qualifies as a third-party custodian under the *Perlman* doctrine, because a former attorney is not guaranteed to stand in contempt to protect his or her former client's privilege. *See In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d at 800-01. I believe, as do the majority of other circuits that have addressed this issue, that there is no reason to apply a different rule to current attorneys. *See, e.g.*, *In re Grand Jury Subpoenas*, 123 F.3d 695, 699 (1st Cir. 1997) ("[W]e adopt the majority rule and apply the *Perlman* exception to those cases wherein a client seeks immediate appeal of an order compelling production of a client's records from his attorney."); *In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d at 203 (holding that current attorneys qualify as third-parties under *Perlman*); *In re Grand Jury Proceedings (Gordon)*, 722 F.2d 303, 307 (6th Cir. 1983) ("This Court . . . joins the majority of other Circuits in applying the *Perlman* exception in those cases wherein a client seeks immediate appeal of an order compelling testimony from his attorney."); *In re Klein*, 776 F.2d 628, 632 (7th Cir. 1985) (applying the *Perlman* doctrine to current attorneys); *In re Grand Jury Proceedings (Malone)*, 655 F.2d 882, 885 (8th Cir. 1981) ("[T]he *Perlman* exception is available to a client-intervenor

11

when he is appealing an order compelling testimony or documents from his attorney."); *In re Grand Jury Proceedings*, 689 F.2d 1351, 1352 n.1 (11th Cir. 1982) (explaining that the Eleventh Circuit is bound by the Fifth Circuit's holding that attorneys are third-parties under Perlman). While a client's interests may be more closely aligned with his or her current attorney than with a former attorney, a client cannot control whether his or her attorney chooses to stand in contempt.

Moreover, to the extent that current attorneys are "interested parties," they, like former attorneys, are unlikely to be so interested that they will stand in contempt to protect their client's privilege. *See In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d at 203 ("we can say without reservation that some significant number of client-intervenors might find themselves denied all meaningful appeal by attorneys unwilling to" stand in contempt on their client's behalf). Accordingly, because an attorney need not, and probably will not, stand in contempt to protect his or her client's privilege, I believe that our Court's longstanding interpretation of the *Perlman* doctrine requires finding that current attorneys are third-parties.

Additionally, requiring attorneys to stand in contempt to enable their clients to appeal unnecessarily fosters conflicts of interest between attorneys and their clients. As the First Circuit explained in overruling its prior decision excluding attorneys from the *Perlman* doctrine, requiring attorneys to stand in contempt "pits lawyers against their clients" by requiring attorneys to choose between protecting their clients' interests and protecting themselves against potentially serious contempt sanctions. *In re Grand Jury Subpoenas*, 123 F.3d at

12

699 (citing *United States v. Edgar*, 82 F.3d 499, 507-08 (1st Cir. 1996)). I share the First Circuit's view that placing attorneys in this predicament "hinders the fair representation of the client." *Id.*

I am aware that the Ninth Circuit does not ordinarily permit *Perlman* appeals when the custodian is the privilege holder's current attorney. *See, e.g.*, *In re Grand Jury Subpoena*, 825 F.2d 231, 237 (9th Cir. 1987) (declining to apply the *Perlman* doctrine when the custodian is the privilege holder's current attorney). I cannot agree, however, with the Ninth Circuit's logic. The Ninth Circuit implies that a current attorney is more likely to stand in contempt than a former attorney, because a current attorney "'is both subject to the control of the person or entity asserting the privilege and is a participant in the relationship out of which the privilege emerges.'" *Id.* (quoting *In re Grand Jury Subpoena Served upon Niren*, 784 F.2d 939, 941 (9th Cir. 1986)). This reasoning disregards the fact that a privilege holder's control over his or her attorney does not extend to deciding whether his or her attorney stands in contempt. Because the custodian's likelihood of standing in contempt is the relevant type of control under the *Perlman* doctrine, I do not find the Ninth Circuit's reasoning to be persuasive and would hold that we have jurisdiction.

II.    Merits

Instead of dismissing ABC's appeal of the March Order for lack of jurisdiction, I would affirm the District Court's decision on the merits. For the reasons articulated by the majority, I would find that the crime-fraud exception to the attorney-client privilege is fully applicable to the

13

documents that are the subject of the March Order. Accordingly, I would affirm both the March and the June Orders.